UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

In Re                                                    Chapter 7
                                                          Case No.: 19-75714-reg

        RUSSELL FRAGALA

           Debtor

-----------------------------------------------------------X

MYER'S LAWN CARE SERVICES, INC.           Adv. Proc Nio.:

          Plaintiff,

---against---

RUSSELL FRAGALA

          Defendant.

### COMPLAINT FOR NONDISCHARGABILITY OF PLAINTIFF'S CLAIM

The Plaintiff, Myer's Lawn Care Services, Inc., creditor herein (the "Plaintiff" or "Creditor"), through its undersigned counsel, alleges that, pursuant to 11 U.S.C. § 523(a)(2)(4) and (6), its Claim is non-dischargeable. In support Plaintiff submits the following on information and belief:

### Jurisdiction and Venue

1. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334 and the Standing Order of Reference of the United States District Court for the Eastern District of New York. This action is a core proceeding under 28 U.S.C § 157(b)(2)(A) and the Federal Rule of Bankruptcy Procedure 7001(6). Venue is appropriate in this district as the Debtor filed his bankruptcy here.

### Parties

2. The Plaintiff is a creditor in the underlying chapter 7 case pending in this Court.

3. Defendant, Russell Fragala, is the debtor in the underlying chapter 7 case pending in this Court.

## Facts

4. Creditor Myer's is a landscaping contracting and snow removal business located in Carroll County Maryland and has been operating for over twenty years.

5. Debtor Russ Fragala is a resident of Suffolk County, Long Island, New York.

6. Debtor Russ Fragala Landscape Corporation at all times relevant hereto, was a landscaping and snow removal business regularly conducting business in Carroll County Maryland and throughout Maryland.

7. At all times relevant hereto, Debtor Russ Fragala acted as the employee/agent of Russ Fragala Landscape Corporation at 38 Southern Blvd., Suite 6, Nesconset, NY 11767.

8. That Russ Fragala Landscape Corporation, was neither registered as a Corporation nor a Limited Liability Company with the Maryland State Department of Assessments and Taxation on the date of November 1, 2016.

9. On or about November 3, 2016, Creditor Myer's entered into a series of 22 contracts with Debtor Fragala, whereby Creditor Myer's agreed to act as a sub-contractor for Fragala and provide snow removal services, during the 2016 thru 2017 winter months, for 22 different, mostly, Walmart stores (Work Sites) located in Carroll County Maryland and surrounding areas all in Maryland.  Please see sample of one of the 22 contracts annexed hereto as Exhibit (**Ex.**) 1.

10. In an Addendum to said contracts, dated November 10, 2016, Fragala agreed to pay a late fee of two percent (2%) per month on balances owing if invoices Myer's submitted were not paid within 25 days of submission. Please see a copy of the Addendum annexed hereto **Ex. 2**.

11. It is undisputed by the parties that between November 3, 2016 and March 3, 2017 Creditor Myer's fulfilled his part of the contracts to provide said services for all 22 Work Sites. Debtor Fragala paid Creditor Myer's for said services, less $2,070.00, thru February 9, 2017. Since that time Myer's invoiced Fragala for an additional $183,460.00 bringing the total due and owing Myer's $185,530.00 as of March 3, 2017. However, Debtor Fragala has only paid $127,070.00 leaving an unpaid principle balance of $58,460.00. Please see a copy of Creditor Myer's Lawn Care Services, Inc.'s Fragala accounting records annexed hereto as **Ex. 3**.

12. As is explained below in more detail, this case arises from the breach of the 22 contracts referred to above, whereby Creditor Myer's agreed to provide, and Debtor Fragala agreed to pay Creditor Myer's, for snow removal services to the parking lots of the 22 Work Sites from November 2016 through April 2017.

13. Debtor Fragala has refused to pay Creditor Myer's $58,460.00, plus late fees, for said snow removal services. Debtor Fragala does not dispute that the snow removal services were provided, but alleges Creditor Myer's caused damages to the Work Sites when performing the services.

15. This attorney conducted a deposition of the Corporate Designee for BrightView, Jerry Bender, on August 14, 2019, who testified that BrightView had conducted inspections of the Work Sites during October of 2016 to document the conditions of the Work Sites before the snow removal activity began. Please see excerpts from the BrightView Deposition of August 14,

2019, annexed hereto as Ex. 4 at pages 45, 46 and 83. (Going forward, all pages referred to in Exhibit 4 are the actual pages of the deposition depicted in the miniscript.)

16. After the snow season ended and after Creditor Myer's requested the remainder of the funds due for the services it had performed, Myer's received an email from one of Debtor Fragala's employees, Mark Hornstein (Mr. Hornstein), dated June 6, 2017 which stated that he had conducted inspections of the Work Sites and had discovered repairs needed to them supposedly caused by Creditor Myer's snow removal services during the previous snow season. Further, Mr. Hornstein stated that he would forward a comprised list of the repairs needed to be completed by June 26, 2017. Please see copy of June 6, 2017 email annexed hereto as **Ex. 5**. However, the comprised list was never received.

17. Creditor Myer's sent Debtor Fragala an email on June 10, 2017 stating that no list has been received and requesting he forward any reports he had received from Walmart or BrightView as soon as possible. Mr. Hornstein was copied but no list was received. Please see copy of June 10, 2017 email annexed hereto as **Ex. 6**.

18. During his deposition, conducted on August 14, 2019, Mr. Bender testified that he had personally performed the post season inspections of all but a few of the Work Sites on or about June 13, 2017 and that he had reported to Mr. Hornstein that no new damage was discovered at the Work Sites with the possible exception of one cart corral. Mr. Bender could not recall the exact date he spoke to Mr. Hornstein but subsequently produced an email dated June 19, 2017 which memorialized the discussion. See **Ex. 4** at pages 51 and 52 and a copy of the June 19, 2017 email annexed hereto as **Ex.7**. Mr. Bender also testified that when the post season inspections were completed, which found no new damages, the manager or assistant

managers of the specific store signs a statement agreeing that no new damages occurred. **Ex. 4** at pages 81-82.

19. As this attorney did not learn of the BrightView post season inspections until BrightView responded to Creditor Myer's subpoena on May 18, 2018 and the deposition of BrightView's Corporate Designee, Mr. Bender, over two years later, on August 14, 2019, this attorney sent a letter to Mr. Hornstein, dated June 23, 2017, stating the photographs he had provided that he alleged were of the Work Sites were, in fact, not of the Work Sites and that no list of repairs, supposedly caused by Myer's snow removal activity, had been received and, given the considerable amount of money involved, please provide his evidence of the alleged damages by July 5, 2017. See Copy of June 23, 2017 letter **Ex. 8**. As stated, neither this attorney or Creditor Myer's were aware at the time that Mr. Bender had advised Mr. Hornstein, on or before June 19, 2017, that no new damage had been discovered with the possible exception of one cart corral.

20. Having received no response to the June 23, 2107 letter, this attorney sent a follow up letter to Mr. Hornstein, dated July 7, 2017, stating, given no evidence of the alleged damages had been received, please forward any evidence of damages, or list of repairs supposedly needed, by July 17, 2017. If you have no such evidence or list, then forward the $58,460.00 owed or we will be forced to begin litigation. See copy of July 17, 2017 letter as **Ex. 9.**

21. In the August 14, 2019 Deposition, Mr. Bender testified that BrightView's procedure was to send Debtor Fragala a list of repairs that were discovered during the post season inspections, however no such list was sent to Debtor Fragala because no damages were discovered to warrant such a list. See **Ex. 4** at pages 59 and 60.

22. Amazingly, after Mr. Hornstein had been told by BrightView that no new damages had been discovered and, as established below in paragraph 41, that Debtor Fragala had been paid $551,204.99 by BrightView with no deductions made for damages, the next event was Debtor Fragala had his attorney, Rompel S. Alam (Attorney Alam), send this attorney a letter dated August 11, 2017(August 11 Letter) and it states that Russ Fragala Landscape Corporation was copied. Of course, at the time the August 11 Letter was sent this attorney and Myer's were unaware that BrightView had conducted the post season inspections and found no new damage and had paid Fragala in full with no deductions made for damages. Please see copy of August 11 Letter annexed hereto as **Ex. 10.**

23. The August 11 Letter stated that Attorney Alam was in receipt of this attorney's June 23, 2017 and July 7, 2017 letters, see referenced above, and warned this attorney that I should refrain from any further improper attempts to collect the alleged debt. *Id.*

24. And that Creditor Myer's was in substantial breach of the agreement it entered with Russ Fragala Landscape Corporation because Creditor Myer's had not repaired the damage it caused to the Work Sites while performing snow removal services and if it fails to make the repairs Creditor Myer's will be liable for the costs of the repairs. Further Attorney Alam alleged that she had been advised that Myer's caused damage to curbs, sidewalks, cart stalla and other existing structures located at the 22 Work Sites. *Id.*

25. Further, Attorney Alam stated that, prior to the snow season, her client had conducted pre-season site inspections of the 22 Work Sites to assess if there were any pre-existing damage. Then, on or about June 5, 2017, her client conducted post-season inspections to assess new damage caused by Creditor Myer's activity and that on or about June 6, 2017, Mr. Hornstein, an employee of her Creditor client, contacted Myer's via email and several telephone

calls advising of the damage and that it had to be repaired before June 23, 2017 in order to receive the rest of the payment. She, allegedly, claimed that Creditor Myer's had refused to accept liability and failed to make the repairs, therefore Debtor Fragala began making the repairs at the end of July 2017 and will continue making the repairs for several weeks and, once the repairs are completed, she would send the pre-season and post-season photographs which would, supposedly, document the damages. *Id.*

26. Next, the August 11 Letter stated that the remainder of the balance owed to Myer's may not cover the costs of the repairs and Myer's may owe Fragala for the costs of the repairs. *Id.*

27. Then, Attorney Alam stated that she had heard Creditor Myer's had contacted BrightView regarding the past amount due and she threatened; "…that my client **[Debtor Fragala]** will hold your client **[Creditor Myer's]** liable for breach of contract and tortious interference if your client continues to contact my client's customer [BrightView] directly. *Id.*

28. Finally, Attorney Alam threatened that if Russ Fragala is named personally in a lawsuit that he will file for sanctions against this attorney for attorney fees. *Id.*

29. Later, in his August 14, 2019 deposition, Mr. Bender explained that BrightView sent no damage reports to Debtor Fragala because there were no damages to report. See **Ex. 4** at 59-60.

It is beyond all reasonable doubt that Debtor Russell Fragala knew his August 11 Letter was false when it stated Creditor Myer's had caused extensive damage to the Work Sites because Debtor Russell Fragala had been advised, on or before June 19, 2017, by BrightView, that it had discovered no damage to the 22 Work Sites, with the possible exception of one cart corral,

31. Debtor Russ Fragala and Russ Fragala D/B/A Russ Fragala Landscape Corporation answered the Complaint. Then, on January 10, 2018, after being told by BrightView that Creditor Myer's had not caused any damage to the Work Sites and having been paid in full by BrightView, Debtor Russ Fragala and Russ Fragala D/B/A Russ Fragala Landscape Corporation filed a Counter-Complaint against Myer's alleging Creditor Myer's caused damages to the Work Sites, while providing said services, causing Defendants to incur "…losses in the amount of $83,755.00 plus travel expenses as a result." Please see Counter-Complaint attached as **Ex. 11**.

34. On or about March 28, 2018, Creditor Myer's caused a Subpoena to be served on BrightView which requested it to produce any and all business records it has regarding the facts of the present case. As is explained below, it is the documentation BrightView produced and the statement of BrightView's counsel, Patrick O'Reilly, Esquire, (Attorney O'Reilly) which revealed Debtor Fragala's fraudulent and felonious conduct in this matter.

35. The records BrightView provided disclose that, on or about November 1, 2016, BrightView inspected the Work Sites and made a pictorial record of the Work Sites' condition prior to providing any snow removal services. Apparently, these records were made for reference purposes to determine if any damages occurred to the Work Sites, which may, or may not, have been caused by the snow removal services from November of 2016 through April 2017.

36. With the records, Attorney O'Reilly provided the undersigned attorney with a cover letter and an email, dated May 24, 2018, which states, among other things, that BrightView has not received any correspondence from Russ Fragala Landscape Corporation and/or any of the 22 businesses involved and/or any entity related to the businesses regarding alleged damage caused by snow and/or ice removal operations after January 1, 2014. Further, that all the amounts owed

to BrightView from the customers for the snow removal services were paid to BrightView by the customers in full, with no deductions made for alleged damages. And that all the amounts owed to Fragala Landscape Corporation for the snow removal services were paid to it by BrightView, in full, again with no deductions made for alleged damages caused by the snow removal operations. Please see a copy of Attorney O'Reilly's letter, dated May 24, 2018, annexed hereto as **Ex. 13**.

37. On July 24, 2019, Creditor Myer's noticed the deposition to be taken on August 7, 2019 of Russ Fragala, Mark Hornstein and Mellissa Hayes but they did not appear for the deposition. Please see copy of July 24, 2019 Notice of Deposition and this attorney's cover letter to Debtor Fragala annexed hereto as **Ex. 14**.

38. The deposition of BrightView was also noted for and was taken on August 14, 2019. See copy of Notice of Deposition annexed hereto as **Ex. 15.**

41. Creditor Myer's records reveal that Debtor Fragala paid it a total of $337,305.00 for snow removal services it performed from December 15, 2016 through March 3, 2017. See **Ex. 3**.

42. As a result of the subpoena served on BrightView and its deposition discussed above a number of facts have been established such as:

a. BrightView' records which memorializes that, between November 28, 2016 and May 10, 2018, BrightView paid Debtor Fragala $551,204.99 for the snow removal services conducted at 21 Maryland Walmart Stores and one Burlington Store. See copy of BrightView's record of payments to Debtor Fragala annexed hereto as **Ex. 17**.

b.  During the deposition Mr. Bender reviewed 17 exhibits regarding 17 of the Work Sites which were identified as Exhibits 20 through 39. Please see **Ex. 4** at pages 4-5. Each Exhibit consisted of five components which were documents entitled:

> 1. Landscape Job Sheet- which was a document Debtor Fragala produced in discovery which memorialized work completed at a Walmart Store to repair damage to its parking lot allegedly caused by Myer's snow removal activity of the previous year;
>
> 2. Invoice- which was an invoice issued by Debtor Fragala for the costs to repair the repairs stated in the Landscape Job Sheet which was supposedly sent to Myer's, however Myer's never received them;
>
> 3. An extraction taken from Exhibit 17 of the funds BrightView paid to Fragala for the snow removal services conducted at this particular store;
>
> 4. BrightView Quality Evaluation- which was a document produced to document the post-season inspection at this particular store; and
>
> 5. BrightView Quality Evaluation- Which was a document produced to document the pre-season inspection at this particular store.

43. For the convenience of the Court, this attorney will not go through each of the 17 exhibits but will state they all had the same conclusion which was none of the Work Sites sustained any damage as a result of Creditor Myer's snow removal activity. Exhibit 21 of the Deposition is a typical example and is explained in **Ex. 4** in pages 85 through 91. Mr. Bender reviewed the Landscape Job Sheet, dated August 1 – 5, 2017, produced by Debtor Fragala, which noted that Debtor Fragala had repaired 14 damaged curbs and 2 bollards at the Walmart Store located at 401 Constant Friendship Blvd,, Abingdon, Maryland, which was reported to have been completed on August 16, 2017. He then reviewed the second page which indicated that Debtor Fragala invoiced Creditor Myer's $3,160.00 for the repairs. However, as stated, Creditor Myer's did not receive the Invoice. The next page was an extraction from BrightView's records which documented that BrightView had paid Debtor Fragala $26,912.05 from January 10, 2017 through May 10, 2017 for the snow removal activity. The next component is the

BrightView Quality Evaluation (BQE) which documented the post-season inspection of the same Work Site the deponent, Jerry Bender, conducted on June 13, 2017, some two months before Debtor Fragala states it did the repair work to the Work Site Debtor Fragala alleges Creditor Myer's caused. Mr. Bender testified that he did not discover any new damage to the Work Site since it was last inspected on October 18, 2016, which was the date of the last BQE pre-season inspection that was the final component of the Exhibit. The pre-season BQE documented that; "Site has numerous cracks and chipping on curbs throughout the property, pot holes, turf damage and cart corrals are bent up and rusty." Please see a copy of Exhibit 21 of the Deposition annexed hereto as **Ex. 18**.

44. Exhibits 20 through 39 of the Deposition all reached the same conclusion that none of the Work Sites sustained new damage as a result of the snow removal activity of the previous snow season.

45. Clearly Debtor Fragala had intentionally concealed from Creditor Myer's the fact that BrightView had examined the Work Sites and determined that no damages had been done by the snow removal activity. In fact, Creditor Myer's, and this attorney were threatened by Debtor Fragala, through Attorney Alam's August 11 Letter, that any direct contact with BrightView would be considered to be a breach of contract and tortious interference. Therefore, Creditor Myer's and this attorney reasonably relied on the threat and did not contact BrightView directly. We now know, via BrightView's response to the discovery request, that there can be no doubt that Debtor Fragala knew that if Creditor Myer's had contacted BrightView directly we would have learned that the Debtor Fragala's allegation of property damage was completely false.

46. At that point, Creditor Myer's was left with no choice but to file the State Action Case.

48. Instead, Debtor Fragala, knowing that it was untrue, fraudulently refused to pay Credit Myer's what was rightfully owed alleging Credit Myer's had caused damages to the Work Sites. Therefore, Credit Myer's filed its' Complaint on September 17, 2017, for breach of contract because Debtor Fragala refused to pay the unpaid balance of $58,460.00, plus late fees of $12,132.23.

49. The late fees have continued to accrue at $38.97 per diem due under the terms of the aforementioned Contracts. As of the date of this pleading, Credit Myer's has incurred a loss of $94,987.45 as a result of the breach by Debtor Fragala of the Contracts which includes the $58,460.00 for the services provided and not paid for, plus $36,527.45 in late fees.

55. Additionally, the letter Debtor Fragala sent to Creditor Myer's, dated August 11, 2017, violated the Federal criminal statute regarding Mail Fraud because the letter was sent for the purpose of executing a scheme to defraud the Creditor Myer's. Please see *Schmuck v. United States*, 489 U.S. 705, 721 (1989).

56. Also, the emails sent by Debtor Fragala's employee Mark Horstein and his attorney, in furtherance of the fraud, were in criminal violation of Federal Wire Fraud statutes. Please see *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994).

57. As of September 11, 2017, and all times thereafter, Debtor Fragala has refused to pay, and has not paid, the unpaid balance of $58,460.00, plus late fees of $36,527.45 which continue to accrue at $38.97 per diem due under the terms of the aforementioned Contracts, thereby materially breaching its Contracts with Creditor Myer's.

58. Myer's has incurred a loss of $94,987.45 as a result of the breach by Fragala of the Contracts.

# Pertinent Legal Standards

57. 11 U.S. Code § 523 (a) (2), (4) and (6). Exceptions to discharge, holds:

(a) A discharge under section 727, 1141, 1192 [1] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A)
false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(i)
that is materially false;
(ii)
respecting the debtor's or an insider's financial condition;
(iii)
on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv)
that the debtor caused to be made or published with intent to deceive;
(4)
for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;


(6)
for willful and malicious injury by the debtor to another entity or to the property of another entity;

58. 11 U.S. Code § 101 Definitions
(5) The term "claim" means—
(A)
right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B)
right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

59. In *Cohen v. de la Cruz et al.* 523 U.S. 213 (1998) The Supreme Court held:

> Because § 523(a)(2)(A) excepts from discharge all liability arising

from **fraud,** treble damages (plus attorney's fees and costs) awarded on account of the debtor's **fraud** fall within the scope of the exception. The most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of "any debt" respecting "money, property, services, or . . . credit" that the debtor **has fraudulently obtained.** See *Field* v. *Mans,* 516 U. S. 59, 61, 64. *Id (*emphasis added).

First, an obligation to pay treble damages satisfies the threshold condition that it constitute a "debt." That word is defined as liability on a "claim," § 101(12), which in turn is defined as a "right to payment," § 101(5)(A), which this Court has said means an enforceable obligation, *Pennsylvania Dept. of Public Welfare* v. *Davenport,* 495 U. S. 552, 559. An award of treble damages is an enforceable obligation of the debtor, and the creditor has a corresponding right to payment. *Id.*

Moreover, the phrase "to the extent obtained by" in § 523(a)(2)(A) modifies "money, property, services, or . . . credit"—not "any debt"—so that the exception encompasses "any debt . . . for money, property, [etc.], to the extent [that the money, property, etc., is] obtained by" **fraud.** The phrase thereby makes clear that the share of money, property, etc., so obtained gives rise to a nondischargeable debt. Once it is established that specific money or property has been obtained by **fraud,** however, "any debt" arising therefrom is excepted from discharge. *Id.* at 213-14 (emphasis added).

60. 940. 18 U.S.C. Section 1341-Elements of Mail Fraud holds that:

"There are two elements in mail fraud (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States,* 489 U.S. 705, 721 n. 10 (1989); see also *Pereira v. United States,* 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under…§ 1341 are (a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.")

70. Please see *United States v. Frey,* 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also*, *United States v. Profit,* 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used)

71. Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. The physical act can be summarized as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Allied Investment Corp. v. Jasen, 354 Md. 547, 560, 731 A.2d 957, 963 (1999)* (quoting *Interstate Ins. Co. v. Logan, 205 Md. 583, 588-89, 109 A.2d 904, 907 (1954))*. This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits. As we explained in *Merchants' Nat'l Bank v. Williams, 110 Md. 334, 351-52, 72 A. 1114, 1117 (1909)*: *Darcars v. Borzym*, 379 Md. 249 at 261-62, 841 A. 2nd. 828 at 835 (2004)

72. Conversion, in the sense of the law of trover, consists either in the appropriation of the property of another, or in its destruction, **or in exercising dominion over it in defiance of the owner's rights, or in withholding the possession from him under an adverse claim of title, and all who aid, command, assist, or participate in the commission of such unlawful acts are liable.** *Id.* 379 Md. At 262, 828 A. 2nd. At 835 (emphasis added).

73. The gist of a conversion is not the acquisition of the property by the wrongdoer, **but the wrongful deprivation of a person of property to the possession of which he is entitled.** Nor need there exist a forcible dispossession of property to constitute an act of the defendant a conversion. A conversion may consist of a wrongful, tortious or unlawful taking of property from the possession of another by theft, trespass, duress, or **fraud** and without his consent or approbation, either express or implied. *Id.* 379 Md. at 262, 828 A. 2nd at 836 (emphasis added).

74. Besides the physical act of exerting unlawful control, there is an intent element to the tort of conversion, and a wide range of different states of mind qualify. At a minimum, a defendant liable of conversion must have "**an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.**" *Keys v. Chrysler Credit Corp., 303 Md. 397, 414, 494 A.2d 200, 208 (1985)*. The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property. For example, "[a] purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter, since the auctioneer's acts are an interference with the control of the property." *Id.* 379 Md. at 263, 828 A. 2nd at 836 (emphasis added).

75. Conversion, of course, also may occur when the defendant's intent reaches the level of "actualmalice." *See Middle States Holding Co., Inc. v. Thomas, 340 Md. 699, 702, 668 A.2d 5, 7 (1995)*; *K & K Management, 316 Md. at 174-79, 557 A.2d 983-85*; *Food Fair Stores, 275 Md. at 56, 338 A.2d at 47*; *Siegman, 267 Md. at 316, 297 A.2d at 761*. We have held that, where a defendant commits a tort with "actualmalice," a jury may award the plaintiff punitive damages. *Montgomery Ward v. Wilson, 339 Md. 701, 736, 664 A.2d 916, 933 (1995)*; *Ellerin v. Fairfax Savings, F.S.B., 337 Md. 216, 241, 652 A.2d 1117, 1129 (1995)*; *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc., 336 Md. 635, 652, 650 A.2d 260, 269 (1994)*; *Owens-Illinois v. Zenobia, 325 Md. 420, 463, 601 A.2d 633, 654 (1992)*. Punitive damages are awarded "[based] upon the heinous nature of the defendant's tortious conduct," *Zenobia, 325 Md. at 454, 601 A.2d at 649*, and they serve the purpose of punishing the particular tortfeasor and deterring conduct similar to that which underlay the tort. *Id.*; *see Philip Morris, Inc. v. Angeletti, 358 Md. 689, 773-74, 752 A.2d 200, 246-47 (2000)*; *Bowden v. Caldor, 350 Md. 4, 22, 710 A.2d 267, 276 (1998)*; *Owens-Corning Fiberglas Corp. v. Garrett, 343 Md. 500, 537-38, 682 A.2d 1143, 1161 (1996)*. *Id.* 379 Md. at 263-64, 841 A. 2nd at 836-37.

76. In recent years, the law of punitive damages has undergone significant development. *See, e.g., Montgomery Ward, 339 Md. at 736, 663 A.2d at 933; Ellerin, 337 Md. at 241, 652 A.2d at 1129; Alexander & Alexander, 336 Md. at 652, 650 A.2d at 269; Zenobia, 325 Md. at 463, 601 A.2d at 654*. The leading case in this effort is *Owens-Illinois v. Zenobia*, in which Judge Eldridge, writing for the Court, made it clear that a jury may award punitive damages only when a plaintiff has demonstrated by clear and convincing evidence that the defendant acted with "actualmalice." *325 Md. at 460, 601 A.2d at 652*. **We have defined the term "actualmalice" as "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud."** *Id.; see Bowden, 350 Md. at 23, 710 A.2d at 276; Scott v. Jenkins, 345 Md. 21, 33, 690 A.2d 1000, 1006 (1997); Ellerin, 337 Md. at 228-29, 652 A.2d at 1123*. With respect to the clear-and-convincing standard of proof, we regarded it as "appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm." *Zenobia, 325 Md. at 469, 601 A.2d at 657. Id.* (emphasis added).

77. Our opinions in recent punitive damage cases have examined the intent element of various torts, other than conversion, and defined the type of wrongful motive that may qualify as "actualmalice." In *Zenobia*, this Court explained what is meant by "actualmalice" in the context of products liability, emphasizing that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actualmalice]." *325 Md. at 463, 601 A.2d at 654*. Rather, evidence supports a finding of actualmalice if it shows by clear and convincing evidence that the defendant made "a *bad faith* decision . . . to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer."

78. In *Ellerin*, the Court considered the availability of punitive damages where the defendant had committed **fraud.** *337 Md. at 234, 652 A.2d at 1126*. We examined whether fraud "inherently involves the state of mind and conduct which is ordinarily required for the allowability of punitive damage." *Id. at 229, 652 A.2d at 1123*. We reemphasized that only evidence of "**actualmalice**" supports an award of punitive damages: "**Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing.**" *Id. at 228, 233, 652 A.2d at 1123, 1125*. Because one could commit fraud with only "reckless disregard" for the truth, we concluded that not all instances of fraud warrant the imposition of punitive damages. *Id. at 235, 652 A.2d at 1126*. **Nevertheless, a plaintiff satisfies the element of "actualmalice" and supports a punitive damage award when the evidence shows that the defendant committed fraud with "actual knowledge of falsity, coupled with [an] intent to deceive."** *Id. at 234, 652 A.2d at 1126*. *Id.* 379 Md. at 264-65, 841 A.2nd at 837 (emphasis added).

79. In *Montgomery Ward*, a case involving the tort of malicious prosecution, we reaffirmed the notion that only evidence of "actualmalice" supports an award of punitive damages. *339 Md. at 735-36, 663 A.2d at 933*. We stated that, in a claim of malicious prosecution, punitive damages may be awarded only if there is clear and convincing evidence of "the defendant's wrongful or improper motive for instigating the prosecution" without probable cause. *Id.* It was not enough for the plaintiff in that case to present evidence only of a lack of probable cause, because that alone would allow a punitive damage award where there is an "inadequacy of investigation." *Id. at 735, 663 A.2d at 933*. "Inadequacy of investigation does not mean that [the defendant's] motive was anything other than bringing a thief to justice," a motive that does not equate to actualmalice. *Id.* 379 Md. at 265, 841 A. 2nd at 837-38.

80. Like in the context of products liability, **fraud,** and malicious prosecution, the availability of punitive damages for the tort of conversion depends on the intent of the tortfeasor. While a plaintiff may obtain a compensatory damage award by proving merely that the defendant, without bad faith, intended to exert unlawful dominion over the plaintiff's property, punitive damages may be awarded only if the defendant demonstrated "**actualmalice**" in carrying out the conversion. The term "**actualmalice**" in the context of conversion requires little explanation beyond the definition we have established in our previous cases: **consciousness of the wrongdoing or "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud**." *Zenobia, 325 Md. at 460, 601 A.2d at 652*; see *Bowden, 350 Md. at 23, 710 A.2d at 276*; *Scott, 345 Md. at 33, 690 A.2d at 1006*; *Montgomery Ward, 339 Md. at 735-36, 663 A.2d at 933*; *Ellerin, 337 Md. at 228-29, 652 A.2d at 1123*. Where the defendant converts property with a consciousness of the wrongfulness of that conversion, he or she possesses the requisite improper motive to justify the imposition of punitive damages. *Id.* 379 Md. at 365-66, 841 A. 2nd at 838 (emphasis added).

### AS AND FOR A FIRST CAUSE OF ACTION CREDITOR MYER'S CLAIM IS NONDISCHARGABLE PURSUANT TO 11 U.S.C. § 523(a)(2)(4)(6)

81. When the actions Debtor Fragala committed, established above are applied to 940. 18 U.S.C § 1341, it is revealed that, it is beyond all reasonable doubt, that Debtor Fragala committed the Federal crime of Mail Fraud, which is a felony, when he had his attorney mailed the letter dated August 11, 2017, because Fragala knew it was untrue that Creditor Myer's had caused the damages claimed in said letter and he intended to defraud Creditor Myer's of the funds he rightfully owed Creditor Myer's.

82. Also, the emails sent by Defendant Russ Fragala's employee, Mark Hornstein, and his attorney, in furtherance of the fraud, were in criminal violation of Federal Wire Fraud statutes. Please see *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also*, *United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used).

83. As the facts stated above establish, by clear and convincing evidence, Debtor Fragala knew that BrightView had examined the 22 Work Sites for which Myer's had provided snow removal services and determined that no damage had been done to those sites months before the August 11, 2017 letter was sent and Debtor Fragala's employee, Mark Hornstein, sent the email of June 6, 2017. And that BrightView paid Debtor Fragala $551,204.99 for the services Creditor Myer's had provided, making no deductions for alleged damages.

84. Yet, knowing it to be untrue, Debtor Fragala withheld $58,460.00, rightfully owed Creditor Myer's, under the false representation that Creditor Myer's had caused considerable damage to all of the Work Sites.

85. In fact, Debtor Fragala offended all standards of justice and the dignity of the State Court, when he filed a Counter-Complaint against Creditor Myer's demanding $83,755.00, plus travel expenses, reasonable attorney fees, interest and costs, as compensation for alleged damages to the sites that Debtor Fragala knew were false representations.

86. Creditor Myer's has established that the elements of "<u>actualmalice</u>" are evident in the present case for which a punitive damage award is justified because the evidence shows that Debtor Fragala committed fraud with "<u>actual</u> knowledge of falsity, coupled with an intent to deceive. *Darcars,* 379 Md. at 264-65, 841 A.2nd at 837.

87. Under Maryland law, a fact is material if the person stating or concealing it knows that the person with whom he or she is dealing probably will use the fact in determining his or her course of action. See Maryland Civil Pattern Jury Instructions (MPJI-Cv) 11:4.

88. Under Maryland law, Debtor Fragala's conduct described above constitutes deceit and is compensable. Debtor Fragala made false representations of material facts knowing of the falsity and intended that Creditor Myer's would act in reliance on the false statements which has

caused Creditor Myer's damages in attorney fees and contractual losses to date of $94,987.45. See Maryland Pattern Jury Instructions (MPJI-Cv) 11:1.

89. Under Maryland law, Debtor Fragala's conduct described above constitutes Non-Disclosure and Concealment and is compensable. Debtor Fragala intentionally concealed material facts that he had a duty to disclose with the intent to induce Creditor Myer's to act differently if Creditor Myer's had known the true facts. Such as suing Creditor Myer's for alleged damages allegedly caused by Creditor Myer's snow removal activities when Debtor Fragala knew that was not true has caused Creditor Myer's damages in attorney fees, costs and contractual losses to date of $94,987.45. See MPJI-Cv 11:2.

90. Under Maryland law, Debtor Fragala's conduct described above constitutes a False Representation and is compensable. " A false representation is a statement, conduct, or act by which one intentionally misleads another person about a material fact." See MPJI-Cv 11:3

**WHEREFORE,** Based on the aforementioned facts and law Creditor Myer's respectfully demands judgment for the following:

**Finding;** that the undisputed material facts established Debtor Fragala acted with actualmalice with actual knowledge of falsity, coupled with an intent to deceive when he refused to pay the debt rightfully owed to Creditor Myers and when Debtor Fragala filed the Counter Complaint against Creditor Myer's demanding $83,755.00, plus travel expenses, reasonable attorney fees, interest and costs, as compensation for alleged damages to the Work Sites that Debtor Fragala knew were false representations; and

**ORDERED** that Creditor Myer's debt owed by Debtor Fragala is nondischargable; and it is

**ORDERED** that Debtor Fragala is to pay Creditor Myers actual and punitive damages in the amount of $212,305.00.

Dated: November 22, 2019

Respectfully submitted,

_____
William M. Burke
2807 Bel Court
Manchester, Maryland 21102
(410)-239-1500
*Attorney for Creditor Myer's Lawn Care Services Inc.*
